**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SHIRLEY C. HUFF, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 04-364 Erie |
| | ) |
| v. | ) |
| | ) |
| JO ANNE BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN, J.

Plaintiff, Shirley C. Huff, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security, who found that she was not entitled to supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Huff filed an application for SSI on December 12, 2002, alleging disability since February 19, 2001 due to anxiety, depression, posttraumatic stress disorder, and neck and back pain (Administrative Record, hereinafter "AR", at 82-83, 93). Her application was denied initially, and Huff requested a hearing before an administrative law judge ("ALJ") (AR 61-66). A hearing was held on April 14, 2004, and following this hearing, the ALJ found that Huff was not disabled at any time through the date of his decision, and therefore was not eligible for SSI benefits (AR 17-23, 28-58). Huff's request for review by the Appeals Council was denied (AR 5-8), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons that follow, we will deny the Plaintiff's motion, and grant the Defendant's motion.

## I. BACKGROUND

Huff was born on May 25, 1967 and was thirty-seven years old on the date of the ALJ's decision (AR 82). She completed school through the 11th grade, and worked in the past as a cashier, stock person, teacher's aide, and child care provider (AR 94-99).

Huff was hospitalized on February 19, 2001 following a motor vehicle accident in which

she suffered an injury to her cervical spine (AR 151). She complained of left shoulder and left leg pain (AR 134). A CT scan of the neck demonstrated a subtle, nondisplaced fracture of the lamina of C5 (AR 133). She was treated conservatively by Elio DeMeira, M.D., a neurological surgeon, with immobilization of the neck and a soft cervical collar (AR 151). On February 23, 2001, Huff was seen for a follow-up by her family physician, Bernard Proy, M.D. (AR 206). She complained of headaches, nausea, and left leg pain (AR 206). Dr. Proy recommended a trial of Ultram and Phenergan (AR 206). On February 26, 2001, Huff was seen by Mary Evelyn Pifer, RPA-C, from Dr. Proy's office and reported that although she was sore, she was getting along well with her pain medications (AR 206).

Huff returned to Dr. DeMeira on March 1, 2001 for follow-up of her cervical injury (AR 151). She complained of left shoulder pain and left-sided jaw tenderness with some swelling (AR 151). A neurological examination revealed that Huff was alert and oriented times three, her deep tendon reflexes and cranial nerves were normal, and her sensation and motor power were intact (AR 151). Dr. DeMeira ordered diagnostic studies, and recommended that she continue with her pain medications on a symptomatic basis (AR 151).

An MRI of Huff's cervical spine conducted on March 6, 2001 was negative (AR 155). Additional diagnostic tests, including a nerve conduction study, doppler venous sonogram of the lower extremities, left and right tibia/fibula x-rays, a bone scan, a CT scan of Huff's brain, and an x-ray of her left shoulder were all normal (AR 217, 219-222).

Huff complained of lower leg swelling when seen by Ms. Pifer on March 14, 2001, however, no swelling was detected on physical examination (AR 203). Ms. Pifer felt the swelling was the result of inactivity (AR 203). She was instructed to continue her medication regime (AR 203). On the same date, Ms. Pifer completed a Department of Public Welfare Employability Assessment Form opining that Huff was temporarily disabled from February 19, 2001 until May 19, 2001, due to a C5 lamina fracture and multiple contusions secondary to a motor vehicle accident (AR 209-210). On March 20, 2005, Huff was placed on Zoloft and Inderal for complaints of sleep disturbances, nightmares and headaches (AR 201).

Huff returned to Dr. Proy's office on April 9, 2001 complaining of continued headaches, nightmares, and extremity pain (AR 199). She was not wearing her neck brace since she had

been advised to go without for neck strengthening (AR 199).  Nicholas Fusco, PA-C, found her reflexes were intact, but she exhibited weakness, pain, and decreased range of motion in her upper and lower extremities (AR 199).  Mr. Fusco diagnosed generalized pain, anxiety, depression, and possible post traumatic stress disorder ("PSTD") (AR 199).  She was advised to continue her medications, including Darvocet, Ibuprofen, Zoloft, Propranolol and Promethazine (AR 199).  He also referred her to Dr. Jeffrey Esper for evaluation of her headaches, and recommended counseling to address her nightmares (AR 199).

A cervical spine x-ray conducted May 7, 2001 showed a very minor anterior displacement of the C5 on C6 similar to Huff's prior exam, most likely on a post traumatic basis (AR 153).  Disc spaces were maintained, and no significant degenerative changes were present (AR 153).

Huff telephoned Dr. Proy's office on May 29, 2001 stating that while packing to move, she experienced a severe headache, neck pain and left leg pain (AR 195).  She requested stronger pain medication, and was prescribed Darvocet (AR 195).  On July 12, 2001, Huff again telephoned Dr. Proy's office requesting stronger pain medication, and was prescribe Lodine (AR 194).

On August 17, 2001, Huff was seen by Ms. Pifer and complained of cervical pain, left leg pain, and headaches (AR 190).  On physical examination, Ms. Pifer noted neck tenderness and decreased range of motion, but the remainder of the exam was intact (AR 190).  Ms. Pifer recommended physical therapy for her complaints of cervical and left leg pain (AR 190).

Huff underwent physical therapy for six visits, from August 23, 2001 to September 13, 2001 (AR 158-163).  At the conclusion of her therapy, Huff reported no significant improvement in her pain symptoms (AR 158).  Her physical therapist noted that she tolerated physical therapy poorly, and showed absolutely no progress since her initial evaluation (AR 158).  Following a discussion of her status with Ms. Pifer, her therapist discharged her from further therapy due to a lack of progress (AR 158).

On August 31, 2001, Huff continued to complain of chronic left knee discomfort, left leg pain, and cervical pain (AR 190).  On exam, she exhibited tenderness in the left paraspinous cervical musculature, as well as the left trapezius area, but her neurological examination was normal (AR 190).  Dr. Proy and Ms. Pifer advised Huff that other than physical therapy, they had

3

nothing else to offer her except pain management (AR 190).  Since there were insurance issues, Huff was to get back with them and let her know how she wished to proceed (AR 190).

Huff returned to Dr. Proy's office on September 18, 2001, and stated that she could not afford pain management since her car accident insurance had run out (AR 189).  She also reported that she had discontinued counseling since she could not afford the sessions (AR 189).  Ms. Pifer instructed Huff that she was going to have to learn to deal with her pain, and pain management was her only alternative (AR 189).

On December 17, 2001, Huff reported continuing pain in her neck (AR 183).  She had resumed counseling (AR 183).  Physical examination revealed tenderness of the cervical spine and decreased range of motion (AR 183).  Her medications were continued, and she was referred to pain management (AR 183).

Huff returned to Ms. Pifer on January 24, 2002 complaining of neck and leg pain. Physical examination showed neck tenderness and decreased range of motion (AR 182).  She was restarted on Lodine, and given a prescription for Darvocet (AR 182).

Ms. Pifer wrote a letter to Huff's counsel on February 4, 2002 summarizing her treatment (AR 180).  Ms. Pifer indicated that Huff continued to complain of cervical and left femur pain, but that she and Dr. Proy had both examined her and could not find any physical findings that correlated with her subjective complaints AR 180).  She further indicated they had nothing else to offer her, other than to recommend that she be seen by a pain management specialist (AR 180).

Huff was seen by Tina Hawley, CRNP at Dr. Proy's office on April 17, 2002, who examined her for neck pain complaints (AR 179).  Ms. Hawley found she had a good grip, good color, and no neck swelling (AR 179).  She noted that Huff's EMG study and previous bone scan was "fine," and recommended a repeat bone scan (AR 179).

Huff presented to the emergency room on May 17, 2002 after her left leg had given out on her causing her to fall (AR 164-165).  She complained of neck, wrist and knee pain (AR 164). On physical examination, it was noted that her neck was mildly tender with a decreased range of motion, but her knee was non-tender and she exhibited an adequate range of motion (AR 164). A cervical spine x-ray showed slight scoliosis, and left wrist and left knee x-rays were normal

(AR 165).  She was prescribed pain medication, a wrist splint, and instructed to wear a cervical collar at night and during the day as needed (AR 164).

On July 30, 2002, Huff telephoned Dr. Proy's office and stated that she had seen John Balmer, D.O., who felt that pain management was a waste of time and money (AR 175).  Dr. Balmer recommended that she undergo osteopathic manipulation, which he was willing to perform (AR 175).  Dr. Proy's office advised her to continue follow-up with Dr. Balmer for her neck pain (AR 175).

Huff returned to the emergency room on August 25, 2002 again stating that her left leg had given out on her causing her to fall (AR 166-167).  Cervical spine, left wrist, and lumbosacral spine studies were all negative (AR 167-168).  An EEG was also normal (AR 214).  She was prescribed pain medication and a muscle relaxant (AR 166).

Huff underwent a psychiatric evaluation performed by Asha Prabhu, M.D. on September 4, 2002 (AR 235-236).  Huff reported anxiety, sleep disturbances, nightmares, poor concentration, crying spells, and feelings of helplessness and hopelessness (AR 235).  She denied any suicidal or homicidal ideations, paranoia or hallucinations (AR 235).  On mental status exam, her mood was depressed and her affect constricted, she was alert and oriented times three, and her speech was relevant and goal directed (AR 236).  Her memory, insight and judgment were all intact (AR 236).  Dr. Prabhu diagnosed major depression, single episode, and PTSD, and assigned her a global assessment of functioning ("GAF") score of 55 to 60 (AR 236).[1]  She prescribed Paxil, Ambien and Xanax (AR 236).

Huff returned to Dr. Proy's office on September 9, 2002 for follow-up (AR 174).  She reported that she had seen Dr. Balmer on September 5, 2002 for an adjustment of her neck which somewhat helped the pain (AR 174).  She was still wearing a neck brace and left wrist splint (AR 174).  Huff exhibited neck tenderness and decreased range of motion on physical examination

_____

[1]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness.  Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000).

(AR 174).  She still had some mild wrist pain and tenderness, but had a good range of motion (AR 174).  She was referred to physical therapy for her neck and wrist pain, and was to continue with Dr. Balmer for her neck pain (AR 174).

Huff began a course of physical therapy on September 16, 2002 continuing until October 29, 2002 (AR 225-234).  On initial evaluation, the therapist noted that her "signs and symptoms were inconsistent with diagnosis.  Patient's functional movement pattern does not coincide with ROM limitations and functional limitations and impairments ... ." (AR 233).  On discharge, Huff reported that her low back pain had improve with treatment, but her neck continued to stiffen (AR 225).  She was discharged with a home exercise program (AR 225).

On September 23, 2002, Huff reported that her wrist pain had greatly improved with physical therapy, but her neck pain had not (AR 171).  She claimed to have pain radiating pain down her back and into her left leg, but her straight leg raising test was negative (AR 171).  She exhibited tenderness on palpation of the cervical spine and lumbar spine, with a decreased range of motion of the cervical spine (AR 171).  She had no tenderness of her left forearm or wrist, and a good range of motion (AR 171).  She was prescribed physical therapy for low back pain, and was to continue therapy for her wrist and neck pain (AR 171).

On October 3, 2002, treatment notes from Dr. Prabhu's office show Huff's sleep was better with the Ambien although it knocked her out, and her anxiety was controlled with Xanax (AR 230).  October 30, 2002, treatment notes reflect that Huff's symptoms were well managed with medication (AR 237).

Huff returned to Dr. Prabhu on November 27, 2002 complaining of bad dreams (AR 237).  Her mood was depressed and her affect was constricted (AR 237).  She denied feelings of helplessness and hopelessness, and reported that her anxiety was more in control with the Xanax (AR 237).  Dr. Prabhu assessed major depression, and advised her to continue her medications (AR 237).

On March 1, 2003, Huff underwent a consultative physical examination performed by Curtis Helgert, D.O. (AR 250-252).  On physical examination, she had a reduced neck range of motion, some decreased left upper arm sensation, slight left arm weakness, and limited range of motion of the lumbar spine (AR 251-252).  Her gait was stiff and slow, but she was able to walk

6

on her heels and toes (AR 252). Examination of her lower extremities showed no significant findings (AR 252). Dr. Helgert formed an impression of fracture of C5, depression and post traumatic stress syndrom by history (AR 252). He opined that Huff was unemployable "based on her demeanor in the exam room with regard to motion of her neck and so on" and that her limitations appeared to have "a pretty significant emotional component to it" (AR 252). However, Dr. Helgert considered it premature to "suggest that she is disabled for life", and felt that "whether she is physically capable of it or not, she would not tolerate any sort of lifting or postural maneuvering" and had restrictions with regard to prolonged sitting (AR 252).

Ronald R. Zelazowski, Ph.D., performed a consultative psychological evaluation on March 7, 2003 (AR 253-258). Huff reported she was unable to work because she was scared to drive (AR 253). She was however, able to drive to the grocery store but not on highways (AR 253). She complained of difficulty concentrating, irritable moods, difficulty in being in enclosed places, crying spells, insomnia, nightmares and fear of crowds (AR 254-255). She further claimed that since the accident, she suffered from panic attacks approximately two times per week or more for no apparent reason (AR 255).

On mental status examination, Dr. Zelazowski observed that Huff's posture, bearing, hygiene and degree of eye contact were within normal limits, and no shifts in anxiety level were observed during the interview (AR 255). He noted that she walked somewhat slowly and stiffly, holding herself in a somewhat stiff posture while seated (AR 255). He found her speech was coherent, relevant, and goal-directed, with normal rate, rhythm, and tone, with no evidence of a formal thought disorder (AR 255). Her affect was somewhat constricted, but was appropriate to the thought content and situation (AR 255). She described her mood as "not too bad" (AR 255). She denied hallucinations, illusions, delusions, depersonalization, derealization, obsessions, compulsive behavior, phobias, homicidal ideation, and hypochondriacal symptoms (AR 255). She had below average fund of intelligence, but was capable of abstract thinking (AR 256). Her memory processes were grossly intact, and she reported adequate social judgment (AR 256). She reported difficulty controlling her temper at times (AR 256).

Huff's self-described activities of daily living included shopping once or twice per week for a few things, cooking four nights per week with her daughter's help, washing a few dishes,

vacuuming twice per week, and doing a load of laundry each day (AR 257). Although she had trouble with irritability, she was able to communicate with others (AR 258). With respect to concentration, persistence and pace, Huff reported that she could read for ten minutes and watch television for up to a half-hour (AR 258).

Dr. Zelazowski diagnosed Huff with major depressive disorder, single episode, moderate severity, chronic PTSD, and panic disorder with agoraphobia (AR 257). He indicated that her prognosis was guarded, and recommended continuation of her appointments with the psychiatrist to adjust her medications, and more frequent visits with her counselor (AR 257). He opined that some improvement in her condition could be expected if she followed these recommendations (AR 257).

Based upon his evaluation of Huff, Dr. Zelazowski completed a mental capacity assessment form (AR 259-260). He opined that Huff had a "good" ability to use judgment and interact with supervisors; a "fair" ability to follow work rules, relate to co-workers, deal with work stresses, function independently, maintain attention/concentration, understand, remember and carry out simple job instructions, maintain personal appearance, relate predictably in social situations, and demonstrate reliability; and a "poor/none" ability to deal with the public, understand, remember and carry out complex or detailed job instructions, and behave in an emotionally stable manner (AR 259-260).

On March 9, 2003, a cervical spine MRI which showed a central to right-sided mild to moderate size herniated disc with slight upward migration and compromise of the right neural foramina (AR 218).

On April 1, 2003, Dr. Proy referred Huff to Dr. Balmer for pain management (AR 338-340). Huff denied suffering from back or neck pain, and denied suffering from any anxiety or depression (AR 338). On physical examination, she exhibited full neck range of motion, with no spasm, swelling or tenderness (AR 338). She walked with a normal gait, had no spine tenderness, and exhibited normal strength in her upper and lower extremities (AR 339). Dr. Balmer recommended that she undergo epidural injections (AR 339). Pursuant to Dr. Balmer's recommendation, Huff underwent cervical epidural steroid injections on April 2, 2003, April 30, 2003 and May 22, 2003 (AR 293-324).

In an undated letter, Dr. Balmer wrote Huff's insurance company and opined that she had suffered severe injuries that were permanent, and despite medical and psychiatric care, her condition had shown little lasting improvement (AR 243).  He diagnosed neck pain, somatic dysfunction of the neck, left leg pain, post traumatic stress syndrome, somatic dysfunction of the head, thoracic, lumbar, sacrum, pelvis, and extremities (AR 243).

On April 3, 2003, Sanford Golin, Ph.D., a state agency reviewing psychologist, completed a Psychiatric Review Technique form and concluded that Huff had a mild degree of limitation in her activities of daily living, a moderate degree of difficulty in maintaining social social functioning and in maintaining concentration, persistence or pace, and no repeated episodes of decompensation  (AR 275).  On the same date, Dr. Golin completed a Mental Residual Functional Capacity Assessment form (AR 261-264).  Dr. Golin concluded that Huff was not significantly limited in her ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; sustain an ordinary routine; work in coordination with others; make simple work-related decisions; ask simple questions; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior; and be aware of normal hazards (AR 262-262).  He further concluded that Huff was only moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual; complete a normal workday and workweek without interruptions from psychologically based symptoms; interact appropriately with the general public and co-workers; respond appropriately to changes in the work setting; travel in unfamiliar places; and set realistic goals or make plans independently of others (AR 261-262).

In making this assessment, Dr. Golin reviewed Dr. Prabhu's evaluation and treatment notes, as well as Dr. Zelazowski's evaluation (AR 263).  He gave great weight to their opinions, and opined that although Huff had a problem dealing with the general public, she could adequately adjust to a work setting (AR 263).

On April 7, 2003, a state agency adjudicator concluded that Huff could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand and/or walk about six hours

in an 8-hour workday; sit about six hours in an 8-hour workday; and was unlimited in her push/pull ability (AR 280).

Huff returned to Dr. Balmer on September 18, 2003 claiming that the epidurals had not relieved her neck pain (AR 336). She also reported anxiety and depression (AR 336). Huff's physical examination showed neck spasms, swelling and tenderness, but she exhibited a full range of motion (AR 337). She was prescribed Neurontin and Vioxx (AR 337).

On October 15, 2003, Huff reported neck pain, but denied anxiety or depression (AR 334). She had a limited range of motion on physical exam, but her strength in the upper and lower extremities was normal (AR 335). Dr. Balmer prescribed Oxycodone (AR 335).

Huff returned to Dr. Balmer on November 24, 2003 for routine follow-up (AR 331). She complained of persistent neck pain, but denied anxiety and depression (AR 331). She reported that the Oxycodone had significantly helped her pain (AR 331). She had a limited range of motion with discomfort on extremes, and normal strength in her upper and lower extremities (AR 332). Flexeril was added to her medication regime (AR 332).

On December 24, 2003, Huff reported that she had presented to the emergency room the previous week with head, neck and back pain (AR 328). She had however, been able to resume cleaning, cooking and shopping (Ar 328). She further reported that Paxil and Xanax were controlling her anxiety and depression symptoms (AR 328). Dr. Balmer found limited range of motion with discomfort on extremes, reduced strength in her upper left extremity, and normal strength in her lower extremities (AR 329).

On January 19, 2004, Huff requested a refill of Oxycontin and Percocet, reporting that these medications had been effective in controlling her pain (AR 325). She denied suffering from anxiety or depression (AR 325). Her physical examination remained essentially the same, although she had regained full strength in her upper left extremity (AR 326).

Huff was evaluated by James Macielak, M.D., an orthopedic surgeon, on January 22, 2994, for cervical pain pursuant to the request of Dr. Balmer (AR 342-345). Huff's gait was normal, and an examination of her neck revealed no anterior masses or tenderness (AR 343). She did exhibit markedly restricted range of motion in all planes (AR 343). In her upper extremities, there was some cog wheel giveaway on manual motor testing (AR 343). There was

10

no dermatomal sensory loss (AR 343).  Dr. Macielak reviewed Huff's previous studies, and formed an impression of herniated disc at C5-6, chronic cervical shoulder girdle myofascial syndrome, chronic pain syndrome, tobacco abuse, and post traumatic stress difficulties (AR 344). He advised against surgery, opining that it would not result in any substantial improvement (AR 344).  He recommended that she reduce the amount of anti-inflammatory medications, and that her treatment include traction (AR 344).

Finally, on August 30, 2004, Dr. Balmer completed a Pennsylvania Department of Welfare form stating that Huff was incapacitated due to cervical disc displacement and cervicalgia (AR 348).

Huff and Fred Monaco, a vocational expert, testified at the hearing held by the ALJ on April 14, 2004 (AR 28-58).  Huff testified that she was able to drive with her cervical collar, but had not been able to cook, clean or shop since the car accident (AR 35-36).  She was left-handed, and had more difficulties with her left arm than her right (AR 36).  She claimed she suffered from pain which radiated down her left arm (AR 37).  Surgery had not been recommended, and epidural injections provided no relief (AR 37).  Huff testified that she was unable to sit for a long period of time and needed to change positions (AR 39, 53).  She was able to stand for about fifteen minutes, and could lift about five pounds (AR 53).  She had trouble walking, and had fallen approximately four times because her left leg gave out (AR 39).  She did not use a cane to walk, and no doctor had recommended that she use a cane (AR 40).

Huff testified that she used a TENS unit approximately four hours per day, as well as ice packs and a heating pad (AR 42).  She claimed that after fifteen to twenty minutes of activity, she had to rest for approximately two hours or longer, and was in bed three to four times a week due to pain (AR 47-48).  She also experienced nightmares and migraine headaches every day  (AR 48, 50).  She engaged in no outside activities (AR 49-50).

The ALJ asked the vocational expert if work existed for an individual of Huff's age, education and past work experience, who was limited to sedentary work that required no more than 45 degrees of bending, using the left dominant hand only as a helping hand, required simple instructions, and who needed to avoid interaction with co-workers, changes in the work setting, and travel to unfamiliar places (AR 54-55).  The vocational expert testified that such an

11

individual could perform work as a surveillance system monitor (AR 56).

Following the hearing, the ALJ found that Huff was not eligible for SSI benefits (AR 17-23). Her request for an appeal with the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 5-8). She subsequently filed this civil action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen,* 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum,* 48 F.3d at 117. The ALJ resolved Huff's case at the fifth step. At step two, the ALJ

determined that Huff's depressive disorder, anxiety related disorder, PSTD, and status post motor vehicle injury, with herniated cervical disc at C6-C7 were severe impairments, but determined at step three that she did not meet a listing (AR 19).  At step four, the ALJ found she had the residual functional capacity ("RFC") for sedentary work, limited to simple instructions, avoiding interaction with the general public, close interaction with co-workers, changes in the work setting, traveling to unfamiliar places, limited to 45 degrees bending, and using her dominant left hand as a helping hand (AR 20).  At the final step, the ALJ determined that Huff could perform the job cited by the vocational expert at the administrative hearing (AR 21-22).  The ALJ additionally determined that Huff's allegations regarding her limitations were not totally credible (AR 22).  Again, we must affirm this determination unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).

Huff's sole argument is that the medical evidence establishes that her combination of impairments precludes her from performing any gainful employment and therefore the ALJ's decision is not supported by substantial evidence.  We disagree, and are of the opinion that the ALJ properly considered all of the medical evidence and other evidence of record in assessing Huff's RFC.  "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'"  *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3rd Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3rd Cir. 1999); *see also* 20 C.F.R. § 404.1545(a).  An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner.  20 C.F.R. § 416.927(e)(2).  In making this determination, the ALJ must consider all evidence before him.  *Burnett*, 220 F.3d at 121.  Social Security Ruling ("*SSR*") 96-5p provides:

> The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of the evidence.

*SSR* 96-5p (1996), 1996 WL 374183 *5.  Here, the ALJ found that Huff retained the RFC to perform work that did not require exertion above the sedentary level, and was limited to simple instructions, avoiding interaction with the general public, close interaction with co-workers,

13

changes in the work setting, traveling to unfamiliar places, limited to 45 degrees bending, and using her dominant left hand as a helping hand (AR 20). For the reasons that follow, we find that the ALJ's RFC determination is supported by substantial evidence.

With respect to Huff's physical condition, it is undisputed that she has a history of cervical injury and a herniated cervical disc. However, diagnostic studies, as well as physical examinations, fail to demonstrate a disabling impairment. Nerve conduction studies, a doppler venous sonogram of the lower extremities, left and right tibia/fibula x-rays, a bone scan, a CT scan of Huff's brain and an x-ray of her left shoulder were all normal (AR 217, 219-222). Dr. Proy, her treating physician, was unable to find any physical findings that correlated to her subjective complaints (AR 180). Huff's most recent physical therapist noted that her signs and symptoms were inconsistent with her diagnosis, and her functional movement pattern did not coincide with ROM limitations and functional limitations and impairments (AR 233).

Treatment notes during the relevant time frame show that while Huff experienced some decreased neck range of motion, no spasm, swelling, or tenderness was noted, and she consistently exhibited a normal strength in her upper and lower extremities (AR 326, 329, 332, 335, 337-339, 343). During the consultative examination with Dr. Helgert, although her gait was stiff and slow, she was able to walk on her heels and toes and move about the exam room (AR 252). Moreover, she represented on several occasions that her medications were controlling her pain (AR 325, 331). Finally, any objective findings of Huff's various physician's were consistent with the physical limitations credited by the ALJ based upon his review of the evidence. He restricted Huff to positions which were sedentary, that required no more than 45 degrees bending, and only required the use of the left dominant hand as a helping hand (AR 20).

Huff appears to suggest that the ALJ erred in rejecting Dr. Helgert's opinion that she was unemployable. Dr. Helgert was a consulting physician, having examined Huff at the request of the Commissioner. The treating physician rule does not apply to a consulting physician's opinion. *Mason v. Shalala*, 994 F.2d 1058, 1067 (3rd Cir. 1993) (doctrine had no application to physician who examined claimant once). Nonetheless, the Commissioner's regulations do acknowledge that, as a general principal, opinions from examining sources are given more weight than opinions from non-examining sources. *See* 20 C.F.R. 416.927(d)(1). The

14

regulations do not require however, that in every case, an examining physician's medical opinion must be favored over that of a non-examining physician.  Instead, the Commissioner must consider a number of competing factors, such as the extent to which there is a treating relationship, the extent to which the opinion is supported by a logical explanation, the degree of the medical source's specialization in a relevant field, and the extent to which the source's opinion is consistent with the entirety of the evidence.  *See generally* 20 C.F.R. § 416.927(d)(1)-(6).

We find that the ALJ evaluated Dr. Helgert's opinion consistent with the above standards.  The ALJ considered Dr. Helgert's reported findings based upon his physical examination of Huff, and concluded that his opinion was based on Huff's subjective complaints, as well as the fact that her limitations involved a "significant emotional component" (AR 19, 252).  The ALJ further pointed to Dr. Proy's examination of Huff, wherein he was unable to find any physical findings that correlated with her subjective complaints (AR 19).  The ALJ declined to place significant weight on Dr. Helgert's opinion since it was inconsistent with the objective medical evidence.  Moreover, we observe that Dr. Helgert also opined that it was, in fact, premature to consider Huff disabled (AR 252).  We therefore find no error in this regard.

To the extent Huff argues that Ms. Pifer's opinion that Huff was temporarily disabled is also entitled to controlling weight, we disagree.  Ms. Pifer, as a physicians' assistant, is not an "acceptable medical source" whose opinion is entitled to controlling weight.  *See* 20 C.F.R. § 416.913(a); *see also Hartranft v. Apfel,* 181 F.3d 358, 361 (3rd Cir. 1999) (holding chiropractor's opinion not entitled to controlling weight under treating physician rule).  Furthermore, we observe that her opinion is devoid of any specific work functions Huff is incapable of performing.  Accordingly, her opinion was entitled to little weight and lends no support to Huff's argument.

We reach the same conclusion with respect to Huff's mental impairments.  The ALJ concluded that her functional limitations as supported by the evidence established only mild restrictions in her activities of daily living, moderate limitations in maintaining social functioning and maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration (AR 20).  Again, we find no error in this regard.  Dr. Prabhu, Huff's treating

psychiatrist, found only moderate symptoms on initial evaluation in September 2002 (AR 236). Treatment notes reveal that her symptoms were well managed with medication (AR 236-237). When examined by Dr. Zelazowski, she reported her mood as "not too bad", and although her affect was somewhat constricted, it was appropriate to the thought content and situation (AR 255). She was capable of abstract thinking, her memory processes were grossly intact, and she exhibited adequate social judgment (AR 256). There was no evidence of formal thought disorder, hallucinations, delusions, depersonalization, derealizations, obsessions or compulsive behavior (AR 255). Recent treatment notes from Dr. Balmer show that she consistently denied suffering from either depression or anxiety during her visits (AR 325, 331, 334, 338). Finally, we note that there is no medical opinion from any treating psychiatrist or consulting psychologist that indicates she is unable to work due to her mental impairments. In any event, the ALJ incorporated any limitations with respect to Huff's mental impairments when he concluded that she was limited to jobs involving simple instructions, and avoiding interaction with the general public, close interaction with co-workers, changes in the work setting, and travel to unfamiliar places (AR 20).[2]

### IV. Conclusion

Based upon the foregoing reasons, the Commissioner's final decision will be affirmed. An appropriate Order follows.

---

[2]Huff cites to *Akers v. Callahan*, 997 F. Supp. 648 (W.D.Pa. 1998), as determinative of her claim for benefits. In *Akers*, the ALJ's decision was "completely infested with misjudgment, mischaracterization of testimony, disregard of competent and largely uncontradicted medical evidence, and wholly lack[ed] substantial evidence to support the denial of benefits," in the face of a record that offered "compelling" support for the claimant's disability based upon a combination of impairments. *Id*. at p. 661. The ALJ's decision in this case does not suffer from the same infirmities.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHIRLEY C. HUFF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 04-364 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| JO ANNE BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

AND NOW, this 8th day of December, 2005, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 11] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 15] is GRANTED.  JUDGMENT is hereby entered in favor of Defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against Plaintiff, Shirley C. Huff.  The clerk is directed to mark the case closed.


s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record.

17